Date signed March 03, 2008



**WENDELIN I. LIPP**
**U. S. BANKRUPTCY JUDGE**

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF MARYLAND
(Greenbelt Division)

| | | |
|---|---|---|
| In re: | * | |
| James Joseph Cranston, IV, | * | Case No. 04-36493-WIL |
| | | Chapter 13 |
| Debtor. | * | |

\*     \*     \*     \*     \*     \*     \*     \*     \*     \*     \*     \*     \*

**MEMORANDUM DECISION IN SUPPORT OF ORDER OVERRULING, IN PART,**
**OBJECTION TO THE CLAIM OF ROBERT F. LEAGAN, MARY LEAGAN**
**<u>AND JEANNE C. KLINE [CLAIM NO. 16]</u>**

The Court has before it the Debtor's Objection to Claim filed by Robert F. Leagan, Mary

Leagan and Jeanne C. Kline (collectively, the "Claimants") [62] and the amended Response

thereto filed by the Claimants [70]. This matter was first heard by this Court on March 9, 2007.

At the conclusion of the March 9, 2007 hearing, the Court asked the parties to file briefs

detailing the costs of completion of the project to support the damages claimed by the Claimants

and the Debtor's response to each item (hereinafter, referred to as the "Parties' Damages

Calculations"). The Parties' Damages Calculations were filed and a continued trial was set for

June 8, 2007, at which time this matter was assigned to the Bankruptcy Dispute Resolution

Program, with the consent of the parties. A dispute resolution conference was held on October

10, 2007; however, the parties were unable to reach an agreement regarding the amount of damages to be awarded to the Claimants.  Accordingly, the trial was rescheduled and the final hearing was held on October 19, 2007.

The Court has reviewed the pleadings submitted by the parties, listened to the testimony presented at the hearings and examined the Parties' Damages Calculations[1] and the exhibits admitted into evidence.  For the reasons set forth below, the Claimants' Claim shall be allowed as an unsecured claim in the amount of $79,210.48.

I.    **Background**

The Claimants filed a proof of claim in the Debtor's bankruptcy case asserting a secured claim in the amount of $300,000.00 for breach of contract (the "Claim").  The contract forming the basis of the Claim was a New Home Agreement of Sale dated May 2, 2002, under which the Claimants retained CCServices, Inc. ("CCServices") to construct a new home for the Claimants in Chesapeake Beach, Maryland (the "Contract").  The Debtor is the president and sole shareholder of CCServices.  There is no dispute that CCServices breached the Contract, resulting in the Claimants filing a Complaint for Damages and Injunctive Relief (the "State Court Complaint") against CCServices and the Debtor, individually, in the Circuit Court for Calvert County, Maryland (the "Circuit Court") on January 22, 2004.

On November 22, 2004, while the Circuit Court litigation was pending, the Debtor filed a petition for bankruptcy relief under Chapter 13 of the United States Bankruptcy Code.[2]  The Claimants timely filed the Claim on January 17, 2005.  Attached to the Claim as supporting

---

[1] The parties agreed that the Court could consider the Parties' Damages Calculations as evidence.

[2] CCServices also filed a voluntary petition under Chapter 7 of the Bankruptcy Code on November 22, 2004, Case No. 04-36488-PM.

-2-

documentation was a one-page Order entered by the Circuit Court on October 30, 2004, granting

a default judgment in favor of the Claimants and against the Debtor and CCServices. Thereafter,

on October 27, 2005, the Circuit Court issued an Opinion and Order entering judgment against

the Debtor, individually, and CCServices, jointly and severally, and in favor of the Claimants, in

the amount of $122,008.52, and in favor of Timothy P. Leahy, Esq., counsel to the Claimants, in

the amount of $14,452.50 for attorneys fees. The total amount awarded was $136,461.02 (the

"Circuit Court Judgment").[3] At the time the Claimants filed the Claim, the Circuit Court

Judgment had not been liquidated. Although the Claimants have never filed an amended proof

of claim, at trial, the Claimants initially limited the Claim to the amount of the Circuit Court

Judgment and ultimately reduced the Claim to $112,389.02. The Debtor concedes that he

breached the Contract, but asserts that the Claim should be established at $16,149.57, including

$1,137 for a home warranty, plus reasonable attorney's fees.

## II.    Discussion

A proof of claim is *prima facie* evidence of the validity and amount of the claim. FED. R.

BANKR. P. 3001(f); *see In re Lewis*, 363 B.R. 477, 481-82 (Bankr. D.S.C. 2007). If an objection

to a proof of claim is raised, the objecting party bears the burden of going forward to produce

evidence sufficient to negate the *prima facie* validity of the filed claim. *See id.* (*citing In re*

---

[3] Although this Court previously determined that the Circuit Court Order dated October 30, 2004, had preclusive effect regarding the Debtor's liability, the Circuit Court's October 27, 2005 Order cannot be afforded the same treatment. By way of background, the Claimants were granted limited relief from the automatic stay in the Debtor's bankruptcy case by an Order entered on March 16, 2005 [47]. This Order allowed the Claimants to pursue the Circuit Court litigation and seek an award of damages against the Debtor. Because the Bankruptcy Judge previously presiding in this case advised the parties that they would have an opportunity to relitigate the Claimants' damages claim in this Court, the Debtor did not participate in the damages hearing in the Circuit Court. Accordingly, this Court will not give the Circuit Court's October 27, 2005 Order awarding damages preclusive effect.

*Allegheny Intern., Inc.,* 954 F.2d 167, 173 (3d Cir. 1992)).  Once the objecting party produces evidence sufficient to negate the validity of the claim, "[t]he ultimate burden of persuasion remains on the claimant to demonstrate by a preponderance of evidence that the claim deserves to share in the distribution of the Debtor's assets."  *Id.*

The dispute in this case concerns the amount of damages to be awarded to the Claimants for CCServices' breach of the Contract.[4]  The Claimants filed the Claim alleging damages in the amount of $300,000.00.  The Debtor filed an objection to the Claim and has produced evidence sufficient to negate the *prima facie* validity of the Claim.  Furthermore, the Claimants have since conceded that the Claim is for a lesser amount.  The burden is on the Claimants to prove by a preponderance of evidence the validity of the Claim.

"The amount of damages recoverable for breach of contract is that which will place the injured party in the monetary position he would have occupied if the contract had been properly performed."  *Hall v. Lovell Regency Homes Ltd. P'Ship, et al.,* 708 A.2d 344, 349 (Md. Ct. Spec. App. 1998).  In a breach of contract action stemming from a real estate construction contract, "[t]he primary measure of damages is the cost of repairing or remedying the defect."  *Id.* Accordingly, the major component of the damages recoverable by the Claimants is the cost they incurred in completing the construction of their new home as contemplated by the Contract and any agreed upon amendments thereto.

A.    **Completion Costs**

---

[4] The Contract was between the Claimants and CCServices.  Because the Debtor was found liable for the breach of the Contract by CCServices, this Court refers to the Debtor and CCServices interchangeably.

The Contract price for the construction of the Claimants' home was $204,000.00.  The construction project was funded through a construction loan obtained from 1st Mariner Bank.  Disbursements under the construction loan were made pursuant to a Construction Loan Draw Schedule that provided for six draws to be made after inspection by an officer of 1st Mariner Bank.  The parties agree that CCServices completed the work necessary for the release of the first three draws totaling $112,000.00.  It is also undisputed that CCServices performed additional work not contemplated by the Contract.  This supplemental work entitled CCServices to an additional payment of $11,072.00, which increased the total Contract price to $215,072.00.  The total amount paid directly to CCServices for work performed on the construction project was $118,272.00.

The Claimants presented evidence that the cost of completion of the project after the breach by CCServices was $146,479.24.  The Claimants submitted into evidence various receipts and contracts to support this figure and presented credible testimony regarding the work performed on the project after the Contract was breached.  The Debtor disputes this amount and maintains that the completion costs should be limited to $15,012.57.  The Debtor contends that (i) the Claimants were overcharged by the contractors they retained to finish the construction project, (ii) the Claimants purchased unnecessary or duplicate materials and (iii) the Claimants made significant upgrades that were not contemplated by the Contract.

Mr. Leagan and the Debtor testified at trial.  The Claimants also called two additional witnesses who worked on the project after CCServices breached the Contract, namely, Eugene Jones, an excavator, and Ron Thomas, the owner of Maryland Heating and Cooling.  The Claimants' witnesses all testified that a significant amount of work completed by CCServices

had to be removed and replaced by subsequent contractors.[5]  This created additional expense and delays to the project.

Much of the Debtor's testimony consisted of his description of the work performed by CCServices under the Contract and his opinion regarding the reasonableness of the completion costs incurred by the Claimants after CCServices breached the Contract.  The Court notes that the Debtor did not enter the project after his services were terminated.  His opinion regarding upgrades to the project and the quantity of materials purchased was based on his review of the receipts and work orders submitted into evidence by the Claimants.  For the most part, the Debtor's calculation of damages was speculative and unsupported by the evidence.  That said, after the Debtor raised issues regarding the scope of the work performed on and the materials purchased for the deck and basement, the Claimants acknowledged that some of the work was outside the scope of the Contract and conceded that the Claim should be reduced by $24,072.00.[6]

Based upon the testimony of the Claimants' witnesses and the documentary evidence, the Court finds that the completion costs incurred by the Claimants should be allowed subject to a reduction of $5,027.30.  Specifically, a  review of the receipts and invoices submitted into evidence by the Claimants and included in their damages calculation reveals that the Claimants included the cost of appliances purchased from Lowe's Companies, Inc. ("Lowe's") in the

_____

[5]  For instance, Mr. Leagan testified that a substantial amount of drywall installed by CCServices had to be removed because it was installed prior to the installation of all of the required electrical wiring.

[6]  Specifically, Claimants suggest that the Claim be reduced by: (i) $11,072 for work performed by CCServices under an agreed upon addendum to the Contract; (ii) $10,500 for additional work completed in the basement by CCServices; and (iii) $2,500 for decking materials included in the Claim that were not included in the Contract.  As discussed previously, the Court has added the $11,072 for additional work performed by CCServices to the Contract price of $204,000.00, bringing the total Contract price to $215,072.00.

amount of $2,372.20 and a bathroom estimate in the amount of $1,782.90 in two separate parts of their calculation. These duplicate expenses total $4,155.10. Additionally, a project estimate and Lowe's receipt submitted into evidence by the Claimants demonstrates that the Claimants purchased appliances from Lowe's for $2,372.20, including tax and delivery. Although the Contract and related Specification Sheet did not generally describe the quality or source of the materials to be used for the project, one exception was an allocation of $1,500.00 for "Sears" appliances. The Claim will be reduced by $872.20 to account for the upgraded or higher priced appliances purchased by the Claimants from Lowes.

In total, the cost to complete construction of the project after CCServices' breach exceeded the Contract price and agreed upon amendments thereto by $36,679.24 (after accounting for the credits conceded by the Claimants).[7] After applying a further reduction of $5,027.30 for the duplicate receipts and appliance upgrades, the Court finds that the Claimants should be awarded damages in the amount of $31,651.94 for costs incurred in completing the construction of the project.

**B.    <u>Payments to Suppliers</u>**

In addition to the actual costs incurred by the Claimants to complete construction of the project, the Claimants assert that they made payments to suppliers in the amount of $38,637.71 to avoid the imposition of mechanic's liens on the real property. Specifically, the Claimants presented testimony that they paid $27,989.89 to Dunkirk Supply, $9,295.82 to Howlin Concrete, Inc. and $1,352.00 to Feel Safe Security. The Claimants argued, and the Debtor

---

[7] The Court calculated this number as follows: cost of completion ($146,479.24) less the unpaid balance due under the Contract ($215,072.00 - $118,272.00 (payments to CCServices) = $96,800) less an additional $13,000.00 in credits conceded by the Claimants for a total of $36,679.24.

agreed, that Dunkirk Supply and Howling Concrete, Inc. (collectively, the "Suppliers") were supposed to be paid from the funds released from 1st Mariner Bank to CCServices. It is also undisputed that CCServices failed to pay the Suppliers from the draw proceeds it received. The Debtor, however, argued that the draw funds CCServices received went to pay other suppliers and that the Suppliers would have been paid from the proceeds of a subsequent draw.

The Court rejects the Debtor's argument. It is undisputed that a portion of the draw proceeds received by CCServices was to be used to pay the Suppliers and that CCServices failed to submit payment, causing the Claimants to draw from the construction loan to pay the Suppliers directly. The Claimants are entitled to reimbursement of the $37,285.71 paid directly to the Suppliers. As for the $1,352.00 allegedly paid by the Claimants to Feel Safe Security, the Claimants failed to prove that CCServices was supposed to pay Feel Safe Security from the draw proceeds and this expense will not be allowed.

## C.    **Consequential Damages**

In addition to the costs incurred in completing the project, the Claimants seek consequential damages as a result of CCServices' breach. "[I]n order for an aggrieved party to recover for another's breach of contract, the damages sought must arise naturally from the breach of contract itself or must have been reasonably within the contemplation of the parties at the time the contract was entered." *Stone v. Chicago Title Ins. Co. of Md.*, 624 A.2d 496, 502 (Md. 1993). The consequential damages requested by the Claimants include the following.

### 1.    **Loan Charges and Fees**

The Claimants' damages calculation includes $3,080.00 in refinance charges and $5,539.57 in late charges assessed on the construction loan. The Debtor argued that these fees

should not be allowed because they did not result from CCServices' breach as the Claimants would have refinanced the construction loan into a traditional mortgage loan upon completion of the project. Additionally, the Debtor argued that factors outside the Debtor's control, such as excessive rain and the failure of the Claimants to make timely decisions, caused delay in the completion of the project.

With regard to the refinance charges in the amount of $3,080.00, the Court finds that there was insufficient evidence to determine whether these charges were incurred as a consequence of CCServices' breach. The only documentation the Claimants submitted into evidence to support the refinance charges was a HUD-1 Settlement Statement for a Second Mortgage (the "Settlement Statement"). The Settlement Statement provides no information as to the purpose or amount of the loan. Rather, the only detail contained in the Settlement Statement is a breakdown of the $3,080.00 in settlement charges. The Claimants asserted in their closing argument that the refinance charges were incurred because the term construction loan became due and the Claimants had to refinance to avoid foreclosure. Closing argument is not evidence. This Court can find nothing in the record that attributes this expense to CCServices' breach. On the contrary, paragraph 17 of the State Court Complaint provides that the parties intended to refinance the construction loan upon the project's completion. The Claimants failed to meet their burden of proof with regard to the settlement costs/refinance charges and that portion of the Claim will be disallowed.

As for the late charges, paragraph 13 of the Contract provided that construction was to be "substantially completed on or about 120 days after loan pre-approval has been obtained by the Purchaser, all contingencies removed by the Purchaser, and building permit has been obtained by

the Seller."  According to the State Court Complaint, and no evidence having been submitted to the contrary, the original completion date was on or about March 20, 2003.  The Debtor contends that construction delays were caused by the Claimants failure to make timely decisions and inclement weather.  Other than his generalized assertion, however, the Debtor failed to present evidence that the Claimants were dilatory in making decisions.  The testimony regarding rainy conditions does not justify the delay extending over five months.  In addition to the delays occasioned by CCServices' failure to timely complete the project, its breach caused further delays because new contractors had to be retained by the Claimants and a significant portion of the work completed by CCServices had to be removed and replaced by the new contractors.  The $5,539.57 in late charges on the construction loan are damages that the parties would reasonably contemplate to result from CCServices' delays in performing the Contract and will be allowed.

### 2.    **Lost Wages**

Claimants' damages calculation includes $8,400.00 in lost wages.  The Claimants argued that Mr. Leagan had to take a six-week leave of absence from his employment to act as general contractor on the construction project after CCServices' breach.  Mr. Leagan testified that he decided to act as general contractor to minimize "re-procurement costs" associated with completing the project.  Mr. Leagan testified that he spent considerable time securing permits for the project, attending meetings and locating new contractors to finish the project.

The Court is neither convinced that it was necessary for Mr. Leagan to take six weeks leave from work to oversee the completion of the project nor was sufficient evidence submitted to support this portion of the Claim.  Mr. Leagan chose to act as his own general contractor and he hired a new contractor to perform most of the remaining work.  There was insufficient

evidence to determine what services Mr. Leagan performed during those six weeks, how much time he spent on the project and to what extent the work was also performed by the new contractor the Claimants retained.  Further, no wage statements or documented proof of the amount of wages Mr. Leagan allegedly lost as a result of Debtor's breach was submitted into evidence.  The  Claimants' claim for Mr. Leagan's lost wages will be disallowed.

### 3.    Home Warranty

The Claimants include in their damages calculation a request for $5,600.00 for a home warranty.  The Debtor conceded that a home warranty was promised to the Claimants at a cost of $1,137.00 and the parties agreed that the Claimants were not provided with the home warranty. The Debtor denies that the cost of the warranty should exceed $1,137.00 and asserts that the Claimants's cost estimate is based upon a property value in excess of the Contract.  There was no evidence presented that the Claimants ever obtained a home warranty and the Claimants argued that that fact is irrelevant.

The Claimants did not actually incur $5,600.00 for a home warrant and did not adequately explain the price disparity between the home warranty promised by CCServices and the cost of the warranty contained in their damages calculation.  Claimants will be awarded $1,137.00 in damages for CCServices' failure to provide the home warranty contemplated by the parties.

### 4.    Legal Fees

Lastly, the Claimants' damages calculation includes the $14,452.50 judgment for attorney's fees granted by the Circuit Court by default.  The Debtor objected to the reasonableness of the requested fees.  The Contract did not provide for attorney's fees.  Instead,

-11-

the Circuit Court awarded attorney's fees pursuant to the Maryland Consumer Protection Act,

Md. Code Comm. Law, § 13-408(b).

Section 502(a) of the Bankruptcy Code provides, in relevant part, that a claim or interest,

proof of which is filed under § 501, is deemed allowed unless a party in interest objects.  Section

502(b) of the Bankruptcy Code provides, in relevant part:

> Except as provided in subsections (e)(2), (f), (g), (h) and (i) of this
> section, if such objection to a claim is made, the court, after notice
> and a hearing, shall determine the amount of such claim in lawful
> currency of the United States **as of the date of the filing of the
> petition**...[.] (emphasis added).

A substantial portion of the attorney's fees included in the Claim was for services rendered after

the filing of the Debtor's bankruptcy petition.  The Claimants did not assert any basis upon

which they would be entitled to post-petition attorney's fees.  Section 506(b) of the Bankruptcy

Code provides:

> To the extent that an allowed secured claim is secured by property
> the value of which, after any recovery under subsection (c) of this
> section, is greater than the amount of such claim, there shall be
> allowed to the holder of such claim, interest on such claim, and
> any reasonable fees, costs, or charges provided for under the
> agreement or State statute under which such claim arose.

Although § 506(b) is silent as to the ability of an unsecured creditor to recover attorney's fees,

courts interpreting this provision have held that "[a]ttorneys' fees for representation of an

unsecured creditor incurred subsequent to the filing of the bankruptcy petition are not allowable

as a part of the claim in the bankruptcy case." *Insurance Co. of North America v. Sullivan*, 333

B.R. 55, 60 (D. Md. 2005)(*quoting In re Smith*, 206 B.R. 113, 115 (Bankr. D. Md. 1997)).

Because the Claim is unsecured, (as explained below), the Court will reduce the amount of

-12-

attorney's fees to $3,596.26, which is the amount of fees incurred as of the date of the filing of the Debtor's bankruptcy.

### D.    Classification of the Claim

The Claimants assert that the Claim is secured and the Debtor failed to specifically dispute this characterization.  Nonetheless, the Court finds that the Claim is unsecured.  The Order entered by the Circuit Court on October 30, 2004, granted a default judgment in favor of the Claimants.  The October 30, 2004 Order also provided that a hearing on the issue of damages and attorney's fees would be set.  An order by default in an unspecified amount is not a judgment and is not appealable.  *See Farragut Village Condo. Ass'n, Section III v. Bowling*, 896 A.2d 1079, 1081-82 (Md. Ct. Spec. App. 2006).  Rather, it is a determination of liability only.  *Id.* Since the October 30, 2004 Order was not a monetary judgment, it did not result in a lien against the Debtor's real property pursuant to Md. Rule 2-621.  *See Prince George's County v. Commonwealth Land Title Ins. Co.*, 423 A.2d 270 (Md. Ct. Spec. App. 1980) (holding that a lien does not arise until the amount of the judgment has been specified).  Here, the Circuit Court Judgment was not liquidated until after the filing of the Debtor's bankruptcy petition and the automatic stay of 11 U.S.C. § 362(a) precluded the Circuit Court Judgment from becoming a lien on the Debtor's real property.  *See* 11 U. S. C. § 362(a)(5).[8]  Accordingly, the Claim is unsecured.

### III.    Conclusion

For the reasons set forth herein, the Claim filed by the Claimants shall be allowed as an

---

[8]  The Order Granting Motion for Relief from Automatic Stay entered on March 16, 2005 [47], granted the Claimants limited relief from the automatic stay to allow the Circuit Court to enter injunctive relief against the Debtor and to calculate and award damages against the Debtor.  The March 16, 2005 Order provided that the automatic stay remained in effect as to any and all efforts by the Claimants to collect upon any judgment entered against the Debtor by the Circuit Court.

unsecured claim in the amount of $79,210.48.  A separate Order will issue.


cc:     Debtor
        Debtor's Counsel - Maximillian F. Van Orden, Esq.
        Claimants
        Claimants' Counsel - Timothy P. Leahy, Esq.
        Chapter 13 Trustee




**END OF MEMORANDUM**